Ms. Barber's chair for the appellant, and we have Mr. Frederick Steiger for the appellate. Good morning. May it please the Court, opposing counsel, I represent Troy, and his last name is pronounced Travnicek, but I'm going to refer to him as appellant or DASDRA, just for simplicity. The relief we are requesting is that this Court, where we have three choices, either reverse the decision of the trial court in rewarding the mom custody, definitely if that is not reversed or remanded with instructions to recalculate his child support, as the amount that was calculated by the judge has no basis in fact, and is indeed causing a serious financial hardship on the father. And the transportation issue, we would ask the Court to reverse that decision. He will be five years old in July for transportation for visitation. To get into the facts a little bit here, these people were married, a very short marriage, an annulment, and apparently a poor choice on a get-together weekend, during which time the child was conceived. Mom lives in Illinois in Madison County, and actually lives in St. Clair. Dad has always lived on the southern coast. He was in Louisiana when they met. He's now in Texas. He's an engineer. So he obviously needs to be near St. Louis. We'll not do the trip for him as far as his job. And this is what he's trained to do. It's not like he can transition easily into another area of engineering, which would be the greatest if he could do that and move to this area. Anyway, this is a four-year battle. This started a week after this child was born. We have had various visitation orders. The order that had been in effect from the time the child was about a year old until recently was a three-week with mom, two-week with dad split of time. And dad was doing all the transportation for that. Unfortunately, dad's job required him to go to Singapore from the time the child was about 16 months old, until the child was just before his third birthday, to do some work on a rig. And there really was no option. Otherwise, that was going to be the end of his career with ENSCO. This matter has been set for trial several times in the lower court. The first two times continued because the dad was in Singapore. There was another time that it was set and the dad had been back barely a month or two and he was required to be on the southern coast because the rig was being brought over from Singapore and he needed to be there. So that is part of the reason why this case has taken four years to make an initial custody decision. During the time that, well, prior to the time of trial, the mom made it extremely difficult for dad to exercise his visitation. She wasn't willing to work with him on days. She did things like on Valentine's Day, she told dad she couldn't meet him at the airport on Valentine's Day weekend on a Sunday because she had plans, wanted him to come in late at night, wasn't willing to work with him at all. But if he did that, then he ends up getting back to Texas at 10.30 or so at night and this is somebody who's usually up at 4.30 in the morning to get to his job. Additionally, during the course of litigation, there was an order fairly early on for the dad to have regular telephone contact and even a webcam was set up. This was important. It was to my client. This was something that was agreed upon. He installed it. He paid to have somebody go there and install it. The mother wouldn't cooperate. She wouldn't use it. We also had an order indicating that if it gets to the point in the evening that the parent who has the child is putting the child to bed and the child hasn't spoke with the other parent that day to initiate a phone call. Never once did she do that. I mean, throughout the time in Singapore, she didn't do anything. Anyway, the mom also is somebody who has three children. None of these children were conceived during the time – three children with three different fathers. None of them were conceived during marriage. The last child, Abby, she married the father, but the child was conceived when they weren't even married. The father and the mother is a stay-at-home mom now, although – and she's remarried, as I said – although they indicate that she needs to work for financial reasons. The father is well-educated. As I indicated, he's an engineer. During the course of this litigation, he completed his master's degree at Southern Methodist University. He comes from a stable family. He's engaged in pretty wise financial planning for a guy his age. He's only 27 years old. The judge's decision in this case was against the matter that stated the evidence. The factors she had to consider were, under the Family Law Statute, Section 602, there are 10 basic factors when you're determining on an initial custody determination when you're looking at best interest. The first four I don't really need to focus on. Obviously, they each want a custody. They wouldn't be engaged in this. The child's too young to tell us what he or she wants. The judge found that the child has a good relationship, interacts well with both families, and that both communities, both homes and such, the community resources were good. That was sort of a wash, a balance on that. The next four factors, the mental and physical health of the individuals involved, the threat of physical violence, threat of domestic violence as abuse is determined under the Domestic Violence Statute, and whether or not a parent who's awarded custody will encourage a relationship are very, very troubling. The judge seemed to blatantly ignore all the incidents of abuse that we put on as evidence, that we demonstrated. The woman, Stephanie, the mom, got an order of protection against her husband in January of 2010. She's getting an order of protection during the time we're in custody litigation. It's got to be pretty serious. In her pleadings, which a copy of is an exhibit in our initial brief, she indicates, I believe, five incidents of abuse. She talks about him choking her, throwing her down. She indicates that during the time she was pregnant with their youngest child, Abby, he was even abusive to her. I mean, those are pretty serious allegations, yet we have a judge who found that there wasn't domestic violence in the home and it didn't amount to what was defined as domestic violence abuse under the statute. I mean, it flies in the face of reason when you have all of that. We also had evidence from the mom that was contradictory. Although she pled these in her emergency order of protection, which she was granted, she decided to drop it when it came to the plenary. She actually tried dropping it a few days after she got it, but the court would not allow her to do that. We have the mother giving now contradictory accounts, trying to minimize it. It wasn't that big a deal. I mean, she was asked specific questions about, did he beat you up and stuff, and she said no. Then we have Officer Schmulbacher, who was the responding officer the evening, I believe it was January 5, 2010. Met her in the parking lot of Dalletmore General. Now, Officer Schmulbacher, he doesn't have a dog in this fight. I mean, he's got no reason to sway his testimony one way or the other. Yet he indicates that the mom told him that her husband beat the crap out of her, that he's been abusive. We have pictures, which are also attached to your brief, which is perhaps the best evidence that there really is a problem in this house that you don't want to expose a little boy to. We have pictures of the mom with what appear to be choke marks around her neck, black eyes, or darkness under her eyes. She's crying. During this incident, police were initially called to the house because mom was fighting with her new husband's teenage daughter, who reported to the police that mom had hit her. We also have a history that we demonstrated with her new husband, whose name is Tom, that he has a history of domestic violence. I mean, there were orders of protection sought by his former wife against him. There were convictions on misdemeanors for violating those orders of protection. I mean, here we have a pattern. I don't know what more the court needs as evidence of abuse. There's no clear-cut language in the statute, like you have to have six incidents of abuse or anything like that. I don't know how you could find that there wasn't abuse. To further support the judge's point on this, she also indicates that besides there being no evidence of abuse or domestic violence, that she says something to the effect of, the parties were under a lot of stress from the litigation, as if that's supposed to justify choking your wife, beating her up. He also, the night in January when she left the house, he had taken or disconnected the garage door opener, so she couldn't get out. I mean, he was almost trapping her in. And so I don't know what else we need. And to minimize it by saying, oh, they were under stress. Well, people are under stress in their homes all the time, but they don't go home and beat their wife up or their spouse. We also have the issue of this woman's credibility. First of all, there were inconsistencies in her testimony. I mean, she either lied on her pleading, when she initially got the order of protection, and lied to the officer, or she was lying in court. Because you can't have it both ways. She tried to make it like nothing occurred. Well, if nothing occurred, why are you getting an order of protection against your husband? Why are you calling the police? We also have a situation where shortly before trial, it was in April of 2010, at a time when this trial had a May 2010 setting date, the mom has a conversation with her husband's former wife. Apparently, the husband and his former wife had a sexual liaison at a hotel, and the former wife called mom here to tell her. And she told her some other things, according to mom, indicating that Tom, I know there are a lot of characters here, she suspected he had abused their other children sexually. So what is mom's reaction? Mom goes running to the police, and makes a report that she is concerned, suspicious that her husband is sexually abusing, or engaging in sexual conduct with Luke, who is her oldest child. Those are pretty serious allegations to make, in the first place. Also, you don't make them if they're not true, in the middle of custody litigation. So she went and did that. She also did not disclose any of this to the father, who had a right to know what was going on in the house. To go and do this before trial, and then she minimizes it when she's talking to Jane Murphy, who was essentially our hired expert, by basically indicating it was blown out of proportion, or I don't want to talk about this, I want to change the subject. That was also in response to the domestic violence. I guess the question I had is this. Considering all factors were really equal between these parties, in terms of the type of parenting, the homes, the school, the communities, why, even if you didn't find that this went to the level of domestic violence under the statute, why would you take a chance and put a four-year-old little boy in a home like that? But I'm not conceding that it was not domestic violence under the statute. I think these incidents clearly were. The judge also cites two cases, Nolte and Thompson, for reliance on the fact that this doesn't amount to domestic violence. Those cases had nothing to do with this. One was a jurisdictional case, and the other one, I believe the finding would actually support our position. I think the better case to look at in this case was the case of Podiak. I'm not sure if I'm announcing it correctly. P-A-D-I-A-K. But the court specifically made a finding that if there's a threat of it or the specter of it, it's domestic violence. And there doesn't actually have to be violence directed towards the child for there to be a concern and for it to meet, essentially, the statutory criteria. The judge also indicated that although mom made some pretty disparaging and concerning statements about the father, she didn't think that she would do anything to discourage the bond between the father and child. There was obvious hostility. This woman had no problem indicating on the record that she refers to her husband as, rather, the child's father as a sperm donor, that she really doesn't care how the father feels. The father had some issues with the fact that his child was calling mom's new husband daddy. Although mom and her new husband gave contradictory accounts of whether or not the child calls him daddy or whether or not he's encouraged or discouraged from that, mom didn't find this a problem. Mom even admitted that she told our expert, and I believe she told the court, that it would be a dream come true if dad just disappeared, which seems to really not be too concerned about your own son's feelings about his relationship with his father. There just seems to be a very narcissistic bent to the mother. There was also a very manipulative aspect to her testimony and the things she was indicating. Running to the police when you're irritated at your husband and saying he beat the crap out of me. Running to the police when you're mad that your husband had an affair and saying I think he's sexually abusing one of our kids and then saying, no, it didn't happen later. We were just upset. You can't have it both ways. Even if none of these things happen, the violence and the alleged sexual conduct, what kind of home is it where that's what one parent uses as a tactic to get back at the other parent. There was also evidence that the mother has been difficult about exchanges, as I indicated before, of the child. At one point, dad wanted the child's medical records. The child was spending a lot of time in Texas, and dad wanted a physician down there in case there was an emergency, which you would think, as the other parent, you would want available for your child. She wouldn't give him the medical records, even though custody hadn't even been decided at this point, and there's really no reason now to. We had to get a court order for him to get the medical records. And she essentially, she had ignored that. And her indication to my client was, you don't need the records, I have custody. It doesn't make sense. She even indicated at one point that she believes there's cases of vendetta against her. There was just a very narcissistic bent to the mom and a sense that she was in control. The court also made some mistakes in its evidentiary rulings. Judge Donovan, in one of your earlier cases, said something to the effect that you asked the people about the seizing of the pseudofed if the court had made a decision on it, and you said something like, well, how can we review it if there wasn't a decision? That begs the point. You can't review whether or not the evidence I wanted to submit was relevant or whether it should have been introduced, because the judge refused to let me make an offer of proof. This is a simple... You can finish your thought. Thank you. And you won't have time for rebuttal. This is a simple thing. Why not allow it? And it seems to me that it's a fairly reversible error to not. Thank you. Thank you. Mr. Stottingham? Justice Chapman, Ms. Shearer, if it pleases the court, I think it's pretty clear that if Ms. Shearer were the trial judge, we would have had a different result. What we're arguing over and over again is weighing the evidence, interpretation of the evidence. And Ms. Shearer clearly has a different view of the interpretation of the evidence than the judge did. That's the judge's job. As we have been instructed by this court repeatedly, we're not coming up here for a second opinion. We're coming up here to see if the order that was rendered by this judge is supported by the evidence or if it's entered arbitrarily without conscientious judgment. This order is 13 pages, single-spaced. The judge spent seven pages alone, I think, on the issues of the custody decision. This was a case that went on over two days, run very efficiently. I think we probably had in excess of 15, 16 witnesses. You have to, and what Ms. Shearer does, which I think at the trial level is absolutely appropriate, you hammer on your issues that you think are strongest for your case. You hammer on those issues. She focuses on two, what I think in all fairness are very minor issues. We're talking about a child that's 4 going on 5 years old at the time of the trial. Ms. Shearer is quite correct. This was initiated, I think, a week after the child was born by her client serving my client with the initial paternity action. Over those 4 or 5 years, she wants you to single out, or she actually wants to single out, an issue of an OP that was filed in Belleville because Mom got into a tussle with a teenage girl over use of a cell phone. The second thing is Mom gets a phone call from an ex-wife that says, hey, I think your husband may have molested one of my other children. Well, had she not gone to DCFS, she'd be accused of not acting to protect her children. So what she does is she does the appropriate thing, and of course what's left out is there was an investigation, there was nothing there, it did not go further. Those are two very isolated incidents over this 4-year period. I think what we have to look at in looking at- Mr. Steiner, what about what appears to be very obvious bruising on her neck? Well, it's not disputed he grabbed her by the neck. The testimony in detail was that Stephanie got into an argument with his daughter, Autumn, who I think was then 13 years old. She was off the cell phone. Right, and then she pushes Stephanie. Dad comes in and says, hey, wait a minute, I don't want you pushing my daughter. And admittedly, Dad grabs her by the neck. And left some pretty obvious bruises. Absolutely. No question about it. But that's one incident in 4 years. And the incident of Tom's prior batteries and so forth, 8 years prior to the time Landon was born. These people didn't even know each other, and it was 8 years prior to Landon's birth and 12 years prior to our trial. So, I mean, the remoteness, and Judge Duff's very specific. She discusses all of that. It's not, if you had an order that was silent, you could think, well, I guess she really didn't think about it. I guess she wasn't carefully considering those. She considers them, she goes through the evidence, she had the opportunity to see Tom James on the stand and to evaluate him, to see how he behaved, to see what his demeanor, to see if he was really a mean, nasty guy or more of a mean and mild guy. And she, I think appropriately, to give an understanding to her ruling, says it was obvious that these people were under a lot of stress, and things happen when people are under stress. There was not a pattern of abuse, and she clearly stated that. But let's look at what she did find. And this is the important thing, because Ms. Shearer wants to say the other factors were equal. Well, they clearly were not. For the 4 years of Landon's life, he lived with his mother most of the time. She was a stay-at-home mom. He has a little sister that everyone agrees he's very closely bonded with. He has an older brother. Now, I get these wrong all the time. I don't know if he's a stepbrother or a half-brother, but in any event, there are siblings in the household that they had bonded with that everyone agrees, including Mr. Travnicek's witness that he hired and flew down to Texas, that they have a wonderfully close relationship. There was a period of 19 months that Mr. Travnicek was in Singapore building this oil rig. Over that period of time, from the time Landon is 18, 19 months old until the time he's 3 years old, which is a hugely important developmental period, Mr. Travnicek visits a couple of times. Now, nobody's faulting him for that. That was a job assignment. But in looking at who has had what impact on the child and what relationship with the child and development, that's critically important. Mr. Travnicek asked for a custody evaluation. The court granted the custody evaluation and appointed a Ph.D. psychologist, Dr. Tompkins, to do the evaluation. The evaluation was the child should remain with mom. The child should be placed in mom's primary custody. Now, shortly before trial, Mr. Travnicek wanted another evaluation or wanted the court to ignore that evaluation, which was not granted. In terms of his retained witness, Sarah Murphy, she flew down to Texas and she basically did home studies. Dad's home, mom's home. And to the extent that the houses were appropriate, safe, and so forth, I agree they were equal. But what Sarah Murphy testified to was the closeness in mom's home between the kids, the little sister, the older brother, and how they all function as a family. And she was very positive and said it was a very appropriate, warm home situation. Conversely, in Mr. Travnicek's home, he lives with his fiancée. He gets up and goes to work at 6 o'clock in the morning when the boy is still asleep. The girlfriend, fiancée, takes Landon to the daycare, and then dad comes home between 5 and 6 o'clock at night. No siblings in the house, no children of Landon's age in the neighborhood. And this is per their witness, Sarah Murphy. So in that, there's a huge difference. You have a stay-at-home mom with siblings and interaction. You have a kid in daycare. There's no equality of comparison there. His family. His family lives in South Dakota. He lives in Texas. Mom's family is in and around St. Clair County. And, again, a number of witnesses testified to the close relationship with grandma and grandpa and the other siblings. A very important non-party witness was Lori Mott, who is a family attorney in Belleville, has been for 20 years, who happened to be their neighbor. And as we all know, in these cases, non-aligned witnesses are critically important. You have an auto accident, there's somebody standing on the street corner who sees the accident, doesn't have an ax to grind either way. Similarly, you sometimes will have that in family cases, but most often you don't. We can expect that someone's best friend and or sibling will testify favorably. In this case, Lori Mott testifies as a neighbor. She sees the family frequently. She didn't even know for a period of time that this was a blended family. They worked that well together. She testified as to the relationship of what she observed between Landon and the older brother, the little sister, how he looked up to the older brother. Again, not disputed. And I think the judge, fairly, in her role as the evaluator of the credibility of the witnesses, put considerable stock in that testimony. On the issue of the child support, it's all in the record. You just have to take a look at it. Mr. Trapacek wants to argue that he makes about $60,000 a year. The affidavit that he files shows that wages alone are $104,000 a year. You have the financial statement, you have the paycheck stub, you have the tax return. In addition to his wages, he received $40,000 or $50,000 in bonuses and stocks. It's, again, reflected in the record. Judge Duff had the opportunity to look at those. She calculated what the statutory net would be, and then she reduced it substantially to account for the transportation costs that he has. And the idea of the sharing of transportation, Mom is at home with a teenage daughter, an older son, Landon, and a younger daughter. Mr. Trapacek is a single individual. As had been the pattern throughout the case, Mr. Trapacek is able to jump on Southwest and Houston, fly out, pick him up, take him back. To ask Mom to do this, she would, of course, provide transportation to the airport, but for her to find someone else, her husband works full-time, to find someone else to watch these three kids so she could transport is unreasonable. In Judge Duff's order, she does provide that during the summer, Stephanie has to fly down to Texas to pick up Landon to bring him back up for her visitation, and that's on Stephanie's cost. I think in doing the child support, Judge Duff was eminently fair. Mr. Trapacek makes a very substantial income. Stephanie has no income. In balancing the credit, if you will, for the travel cost, I think it's very reasonable. The last thing that Ms. Shearer mentioned was the denial of offers of proof. The record does not bear that out. She requested on multiple occasions to make an offer of proof, and on each occasion that request was granted. It's reflected in the record. The one criticism she had was when she had closed an offer of proof and was going to move on and then wanted to reopen it, Judge Duff said, no, we've been through that. And I think, again, in managing the trial, the record reflects how many times do we need to tell something to the court. And Judge Duff said, I heard it the first time. I don't need to hear it three and four times. Let's move on. Let's try and focus on those things that are relevant. And I would submit to the court that Judge Duff's order is well supported by the evidence. It's the venue in which this child has lived throughout his life. It's the appropriateness of that living relationship. It's the sibling relationship, the big brother, the little sister. It's the way the family works together. It's the opinion of clinical psychologists that this is the appropriate custodial placement. It's not just our witnesses saying that the home is appropriate. It's Mr. Travichek's own home study witness saying that the home is appropriate. Again, we're not here to give our opinion. I'm not here to give anyone's opinion. But this court is not here to give their opinion, to give a second assessment of the evidence, but rather to look and see is there substantive basis for the conclusion that Judge Duff came to. And on the issue of the incidents that occurred, clearly they occurred. There were multiple witnesses. There was a full factual development of that. And the trial judge in the role of the finder of fact and the evaluator of witnesses said it's not a big deal. Judge Duff's been doing this for 20, 25 years. She's seen a lot of cases. I think she is in an excellent position to make that decision. And that is a very small factor in the greater scheme of what's been going on for this little boy for the past four years. I think the order is detailed. It is specific. It recites all of the witnesses. And I think it gives a clear, substantive basis for the ruling. And I would ask the court to affirm that determination. Thank you. Thank you, Mr. Steiger. Ms. Sherry, do you have any follow-up? Your Honor, Mr. Steiger is incorrect when he says the court did not refuse offers of proof. It's in the record. There were two or three times where she just refused to allow me to make an offer of proof. It's true that one time I wanted to reopen and she said no. I can't talk about what would have been in the record if the offer of proof had been there, but it was information that we thought was really clearly relevant. I don't think the judge properly analyzed or gave credence to the factors and to the evidence we submitted. She made comments to the effect, and I have sort of an appendix of comments by the court, which I think are indicative of her dislike and distaste for my client and his case and the way he was putting it on from the beginning. It's in my reply brief. You'll see everything in there. But there was just a general attitude that my client was being nasty. Well, he was. This is not nice stuff to go up there and portray the parent of your child as a liar, as manipulative. And the judge seemed to indicate she didn't want to hear this stuff. Well, I'm sorry, but this was part of it. And when she talks about the evidence being the same thing over and over again, that's the whole point. That gives more weight to it. You have a bunch of people saying there's domestic violence occurring. Now, if we hadn't done that, then we definitely would have lost. You also have the court, I believe it was on the second day of trial, or the end of the first day, saying something about tomorrow I want to hear stuff that's relevant, I want to address these factors, half of what I've heard today doesn't matter. Well, the majority of that day was spent on domestic violence. I would be concerned about a trial judge indicating that doesn't matter. It clearly matters. It would go to two, if not three, of the factors under best interest. There are two factors regarding physical violence, and there's one about mental health. And I think there's a concern about mental health when somebody is in an abusive relationship, allowing it to continue, or lying about it. My client does not want his child raised by a liar. He relied on the court to protect him, and they didn't. They didn't protect him at all. And I think if you look at the judge's decision and her comments and her general attitude, it's not a matter of you reviewing the evidence. But there's no way you could have this evidence before you and find what you did about the mother. She indicates that the mother would not do anything to discourage a relationship. How can you say that when she's making transportation difficult? Mr. Stiger says that the mother drives to St. Louis Airport. That's like combing teeth to get her to do it. It's always her schedule this, her schedule that. She can't do it. Well, if she has all this wonderful family around here who's so supportive, why aren't they helping her out with her kids or running Landon back and forth to the airport? I mean, the other thing is she has a teenage daughter or stepdaughter who's a babysitting age. Why can't she have her watch Luke, who's at least 10 or 11 by now, and Abby while she runs to the airport? You know what? Sometimes you have to pinch it. You have to make adjustments for these things. And considering she's the one who has the child the majority of the time, you know, do it. There's no reason not to. And the judge just seems to have constant deference to the mom. And it seems to be almost like her attitude towards the dad was he's wrong in doing this. She criticizes the dad in her order for running and filing petitions for contempt or asking for court relief every time he doesn't get along with mom. That's not what happened. What really happened was you see dad going back and forth with mom trying to resolve it. And when he's at his wits' end, he does go to the court for relief. I think that's about it unless there are any questions. Thank you. Thank you, Ms. Sheridan. Thank you both for your briefs and arguments. And we'll take a matter under five minutes. The next case on this morning's docket is the case of Troy Travisek v. Stephanie Ewald. And we have Ms. Barbara Sher for the appellant. And we have Mr. Frederick Steiger for the athlete. And you may begin, Ms. Sheridan. Good morning. May it please the court opposing counsel. I represent Troy and his last name is pronounced Travisek. I'm going to refer to him as appellant or dad for simplicity. The relief we are requesting is that this court, where we have three choices, either reverse the decision of the trial court in rewarding the mom custody. Definitely if that is not reversed or remanded with instructions to recalculate his child support as the amount that was calculated by the judge has no basis in fact and is indeed causing a serious financial hardship on the father. And the transportation issue, we would ask the court to reverse that also and require the mother to take part in chaperoning this child who will be five years old in July for transportation for visitation. To get into the facts a little bit here. These people were married. A very short marriage, an annulment, and apparently a poor choice on a get-together weekend during which time the child was conceived. Mom lives in Illinois in Madison County. Now she lives in St. Clair. Dad has always lived on the southern coast. He was in Louisiana when they met. He's now in Texas. He's an offshore drill or rig engineer. So he obviously needs to be near a coast. St. Louis will not do the trick for him as far as his job. And this is what he's trained to do. It's not like he can transition easily into another area of engineering, which would be the greatest if he could do that and move to this area. Anyway, this is a four-year battle. This started a week after this child was born. We have had various visitation orders. The order that had been in effect from the time the child was about a year old until recently was a three-week with mom, two-week with dad split of time, and dad was doing all the transportation for that. Unfortunately, dad's job required him to go to Singapore from the time the child was about 16 months old until the child was just before his third birthday to do some work on a rig, and there really was no option. Otherwise, that would be the end of his career with ENSCO. This matter has been set for trial several times in the lower court. The first two times continued because the dad was in Singapore. There was another time that it was set, and the dad had been back barely a month or two, and he was required to be on the southern coast because the rig was being brought over from Singapore, and he needed to be there. So that is part of the reason that this case has taken four years to make an initial custody decision. During the time that, well, prior to the time of trial, the mom made it extremely difficult for dad to exercise his visitation. She wasn't willing to work with him on days. You know, she did things like on Valentine's Day, she told the dad she couldn't meet him at the airport Valentine's Day weekend on a Sunday because she had plans, wanted him to come in late at night, wasn't willing to work with him at all. But if he did that, then he ends up getting back to Texas at 10.30 or so at night, and this is somebody who's usually up at 4.30 in the morning to get to his job. Additionally, during the course of the litigation, there was an order fairly early on for the dad to have regular telephone contact, and even a webcam was set up. This was important. It was to my client. This was something that was agreed upon. He installed it. He paid to have somebody go there and install it. The mother wouldn't cooperate. She wouldn't use it. We also had an order indicating that if it gets to the point in the evening that the parent who has the child is putting the child to bed and the child hasn't spoke with the other parent that day to initiate a phone call. Never once did she do that. I mean, throughout the time in Singapore, she didn't do anything. Anyway, the mom also is somebody who has three children. None of these children were conceived during the time of – three children with three different fathers. None of them were conceived during a marriage. The last child, Abby, she married the father, but the child was conceived when they weren't even married. The father and the mother is a stay-at-home mom now, although – and she's remarried, although they indicate that she needs to work for financial reasons. Father is well-educated, as I indicated. He's an engineer. During the course of this litigation, he completed his master's degree at Southern Methodist University. He comes from a stable family. He's engaged in, you know, pretty wise financial planning for a guy his age. He's only 27 years old. The judge's decision in this case was against the math that stated the evidence. The factors she had to consider were, under the Family Law Statute, Section 602, there are 10 basic factors when you're determining on an initial custody determination when you're looking at best interest. The first four I don't really need to focus on. Obviously, they each want a custody. They wouldn't be engaged in this. The child's too young to tell us what he or she wants. The judge found that the child has a good relationship, interacts well with both families, and that both communities, both homes and such, the community resources were good. That was sort of a wash, a balance on that. The next four factors, the mental and physical health of the individuals involved, the threat of physical violence, threat of domestic violence, as abuse is determined under the Domestic Violence Statute, and whether or not the parent who's awarded custody will encourage a relationship, are very, very troubling. The judge seemed to blatantly ignore all the incidents of abuse that we put on as evidence, that we demonstrated. The woman, Stephanie, the mom, got an order of protection against her husband in January of 2010. She's getting an order of protection during the time we're in custody litigation. It's got to be pretty serious. In her pleadings, which a copy of is an exhibit in our initial brief, she indicates, I believe, five incidents of abuse. She talks about him choking her, throwing her down. She indicates that during the time she was pregnant with their youngest child, Abby, he was even abusive to her. I mean, those are pretty serious allegations, yet we have a judge who found that there wasn't domestic violence in the home and it didn't amount to what was defined as domestic violence abuse under the statute. I mean, it flies in the face of reason when you have all of that. We also had evidence from the mom that was contradictory. Although she pled these in her emergency order of protection, which she was granted, she decided to drop it when it came to the plenary. She actually tried dropping it a few days after she got it, but the court would not allow her to do that. We have the mother giving now contradictory accounts, trying to minimize it. It wasn't that big a deal. I mean, she was asked specific questions about did he beat you up and stuff, and she said no. Then we have Officer Schmulbacher, who was the responding officer the evening, I believe it was January 5, 2010. Met her in the parking lot of Dalletwood General. Now, Officer Schmulbacher, he doesn't have a dog in this fight. I mean, he's got no reason to sway his testimony one way or the other. Yet he indicates that the mom told him that her husband beat the crap out of her, that he's been abusive. We have pictures, which are also attached to your brief, which is perhaps the best evidence that there really is a problem in this house that you don't want to expose a little boy to. We have pictures of the mom with what appear to be choke marks around her neck, black eyes, or darkness under her eyes. She's crying. During this incident, police were initially called to the house because mom was fighting with her new husband's teenage daughter, who reported to the police that mom had hit her. We also have a history that we demonstrated with her new husband, whose name is Tom, that he has a history of domestic violence. I mean, there were orders of protection sought by his former wife against him. There were convictions on misdemeanors for violating those orders of protection. I mean, here we have a pattern. I don't know what more the court needs as evidence of abuse. There's no clear-cut language in the statute, like you have to have six incidents of abuse or anything like that, but I don't know how you could find that there wasn't abuse. To further support the judge's point on this, she also indicates that besides there being no evidence of abuse or domestic violence, that she says something to the effect of the parties were under a lot of stress from the litigation, as if that's supposed to justify choking her wife, beating her up. He also, the night in January when she left the house, he had taken or disconnected the garage door opener, so she couldn't get out. I mean, he was almost trapping her in. And so I don't know what else we need. And to minimize it by saying, oh, they were under stress. Well, people are under stress in their homes all the time, but they don't go home and beat their wife up or their spouse. We also have the issue of this woman's credibility. First of all, there were inconsistencies in her testimony. I mean, she either lied on her pleading when she initially got the order of protection and lied to the officer, or she was lying in court, because you can't have it both ways. She tried to make it like nothing occurred. Well, if nothing occurred, why are you getting an order of protection against your husband? Why are you calling the police? We also have a situation where shortly before trial, it was in April of 2010, at a time when this trial had a May 2010 setting date, the mom has a conversation with her husband's former wife. Apparently the husband and his former wife had a sexual liaison at a hotel, and the former wife called mom here to tell her. And she told her some other things, according to mom, indicating that Tom, I know there are a lot of characters here, she suspected he had abused their other children sexually. So what is mom's reaction? Mom goes running to the police and makes a report that she is concerned, suspicious that her husband is sexually abusing or engaging in sexual conduct with Luke, who was her oldest child. Those are pretty serious allegations to make in the first place. Also, you don't make them if they're not true in the middle of custody litigation. So she went and did that. She also did not disclose any of this to the father, who had a right to know what was going on in the house. To go and do this before trial, and then she minimizes it when she's talking to Jane Murphy, who was essentially our hired expert, by basically indicating it was blown out of proportion, or I don't want to talk about this, I want to change the subject. That was also in response to the domestic violence. I guess the question I had is this. Considering all factors were really equal between these parties, in terms of the type of parenting, the homes, the school, the communities, why, even if you didn't find that this went to the level of domestic violence under the statute, why would you take a chance and put a four-year-old little boy in a home like that? But I'm not conceding that it was not domestic violence under the statute. I think these incidents clearly were. The judge also cites two cases, Nolte and Thompson, for reliance on the fact that this doesn't amount to domestic violence. Those cases had nothing to do with this. One was a jurisdictional case, and the other one I believe the finding would actually support our position. I think the better case to look at in this case was the case of Podiak, I'm not sure if I'm pronouncing it correctly, P-A-D-I-A-K, where the court specifically made a finding that if there's a threat of it, or the specter of it, it's domestic violence, and there doesn't actually have to be violence directed towards the child for there to be a concern and for it to meet essentially the statutory criteria. The judge also indicated that although Mom made some pretty disparaging and concerning statements about the father, she didn't think that she would do anything to discourage the bond between the father and child. There was obvious hostility. This woman had no problem indicating on the record that she refers to her husband as, rather the child's father, as a sperm donor, that she really doesn't care how the father feels. The father had some issues with the fact that his child was calling Mom's new husband Daddy. Although Mom and her new husband gave contradictory accounts of whether or not the child calls him Daddy or whether or not he's encouraged or discouraged from that, Mom didn't find this a problem. Mom even admitted that she told our expert, and I believe she told the court, that it would be a dream come true if Dad just disappeared, which seems to really not be too concerned about your own son's feelings about his relationship with his father. There just seems to be a very narcissistic bent to the mother. There was also a very manipulative aspect to her testimony and the things she was indicating. Running to the police when you're irritated at your husband and saying he beat the crap out of me. Running to the police when you're mad that your husband had an affair and saying I think he's sexually abusing one of our kids and then saying no, it didn't happen later, we were just upset. You can't have it both ways. Even if none of these things happened, the violence and the alleged sexual conduct, what kind of home is it where that's what one parent uses as a tactic to get back at the other parent? There was also evidence that the mother had been difficult about exchanges, as I indicated before, of the child. At one point, Dad wanted the child's medical records. The child was spending a lot of time in Texas and Dad wanted a physician down there in case there was an emergency, which you would think, as the other parent, you would want available for your child. She wouldn't give him the medical records, even though custody hadn't even been decided at this point and there's really no reason not to. We had to get a court order for him to get the medical records and she essentially ignored that. Her indication to my client was you don't need the records, I have custody. It doesn't make sense. She even indicated at one point that she believes this case is a vendetta against her. There was just a very narcissistic bent to the mom and a sense that she was in control. The court also made some mistakes in its evidentiary ruling. Judge Donovan, in one of your earlier cases, said something to the effect that you asked the people about the seizing of the pseudofed, that if the court had made a decision on it, you said something like you'll have to review it if there wasn't a decision. That begs the point. You can't review whether or not the evidence I wanted to submit was relevant or whether it should have been introduced because the judge refused to let me make an offer of proof. This is a simple thing. You can finish your thought. Thank you. Then you won't have time for rebuttal. This is a simple thing. Why not allow it? And it seems to me that it's a fairly reversible error to not. Thank you. Thank you. Mr. Studding? Justice Chapman, Ms. Shearer, if it pleases the court, I think it's pretty clear that if Ms. Shearer were the trial judge, we would have had a different result. What we're arguing over and over again is weighing the evidence, interpretation of the evidence, and Ms. Shearer clearly has a different view of the interpretation of the evidence than the judge did. That's the judge's job. As we've been instructed by this court repeatedly, we're not coming up here for a second opinion. We're coming up here to see if the order that was rendered by this judge is supported by the evidence or if it's entered arbitrarily without conscientious judgment. This order is 13 pages, single-spaced. The judge spent seven pages alone, I think, on the issues of the custody decision. This was a case that went on over two days, run very efficiently. I think we probably had in excess of 15, 16 witnesses. You have to, and what Ms. Shearer does, which I think at the trial level is absolutely appropriate, you hammer on your issues that you think are strongest for your case. You hammer on those issues. She focuses on two, what I think in all fairness are very minor issues. We're talking about a child that's four going on five years old at the time of the trial. Ms. Shearer is quite correct. This was initiated, I think, a week after the child was born by her client serving my client with the initial paternity action. Over those four or five years, she wants you to single out, or she actually wants to single out, an issue of an OP that was filed in Belleville because mom got into a tussle with a teenage girl over use of a cell phone. The second thing is mom gets a phone call from an ex-wife that says, hey, I think your husband may have molested one of my other children. Well, had she not gone to DCFS, she'd be accused of not acting to protect her children. So what she does is she does the appropriate thing, and of course what's left out is there was an investigation, there was nothing there, it did not go further. Those are two very isolated incidents over this four-year period. I think what we have to look at in looking at... Mr. Steiner, what about what appears to be very obvious bruising on her neck? Well, it's not disputed he grabbed her by the neck. The testimony in detail was that Stephanie got into an argument with his daughter Autumn, who I think was then 13 years old. It was all part of a cell phone incident. Right, and then she pushes Stephanie. Dad comes in and says, hey, wait a minute. I don't want you pushing my daughter. And admittedly, Dad grabs her by the neck. And left some pretty obvious bruises. Absolutely. No question about it. But that's one incident in four years. And the incident of Tom's prior batteries and so forth, eight years prior to the time Landon was born. These people didn't even know each other, and it was eight years prior to Landon's birth and 12 years prior to our trial. So, I mean, the remoteness, and Judge Duff's very specific. She discusses all of that. It's not, if you had an order that was silent, you could think, well, I guess she really didn't think about it. I guess she wasn't carefully considering those. She considers them. She goes through the evidence. She had the opportunity to see Tom James on the stand and to evaluate him, to see how he behaved, to see what his demeanor, to see if he was really a mean, nasty guy or more of a meek and mild guy. And she, I think appropriately, to give an understanding to her ruling, says it was obvious that these people were under a lot of stress, and things happen when people are under stress. There was not a pattern of abuse, and she clearly stated that. But let's look at what she did find. And this is the important thing, because Ms. Shearer wants to say the other factors were equal. Well, they clearly were not. For the four years of Landon's life, he lived with his mother most of the time. She was his stay-at-home mom. He has a little sister that everyone agrees he's very closely bonded with. He has an older brother. Now, I get these wrong all the time. I don't know if he's a stepbrother or a half-brother, but in any event, there are siblings in the household that they had bonded with that everyone agrees, including Mr. Travnicek's witness that he hired and flew down to Texas, that they have a wonderfully close relationship. There was a period of 19 months that Mr. Travnicek was in Singapore building this oil rig. Over that period of time, from the time Landon is 18, 19 months old until the time he's 3 years old, which is a hugely important developmental period, Mr. Travnicek visits a couple of times. Now, nobody's faulting him for that. That was a job assignment. But in looking at who has had what impact on the child and what relationship with the child and development, that's critically important. Mr. Travnicek asked for a custody evaluation. The court granted the custody evaluation and appointed a Ph.D. psychologist, Dr. Tompkins, to do the evaluation. The evaluation was the child should remain with mom. The child should be placed in mom's primary custody. Now, shortly before trial, Mr. Travnicek wanted another evaluation or wanted the court to ignore that evaluation, which was not granted. In terms of his retained witness, Sarah Murphy, she flew down to Texas and she basically did home studies. Dad's home, mom's home. And to the extent that the houses were appropriate, safe, and so forth, I agree they were equal. But what Sarah Murphy testified to was the closeness in mom's home between the kids, the little sister, the older brother, and how they all functioned as a family. And she was very positive and said it was a very appropriate, warm home situation. Conversely, in Mr. Travnicek's home, he lives with his fiancée. He gets up and goes to work at 6 o'clock in the morning when the boy is still asleep. The girlfriend, fiancée, takes Landon to the daycare, and then dad comes home between 5 and 6 o'clock at night. No siblings in the house, no children of Landon's age in the neighborhood. And this is per their witness, Sarah Murphy. So in that, there's a huge difference. You have a stay-at-home mom with siblings and interaction. You have a kid in daycare. There's no equality of comparison there. His family. His family lives in South Dakota. He lives in Texas. Mom's family is in and around St. Clair County. And again, a number of witnesses testified to the close relationship with grandma and grandpa and the other siblings. A very important non-party witness was Lori Mott, who is a family attorney in Belleville, has been for 20 years, who happened to be their neighbor. And as we all know, in these cases, non-aligned witnesses are critically important. You have an auto accident, there's somebody standing on the street corner who sees the accident, doesn't have an ax to grind either way. Similarly, you sometimes will have that in family cases, but most often you don't. We can expect that someone's best friend and or sibling will testify favorably. In this case, Lori Mott testifies as a neighbor. She sees the family frequently. She didn't even know for a period of time that this was a blended family. They worked that well together. She testified as to the relationship of what she observed between Landon and the older brother, the little sister, how he looked up to the older brother. Again, not disputed. And I think the judge, fairly, in her role as the evaluator of the credibility of the witnesses, put considerable stock in that testimony. On the issue of the child support, it's all in the record. You just have to take a look at it. Mr. Trapacek wants to argue that he makes about $60,000 a year. The affidavit that he files shows that wages alone are $104,000 a year. You have the financial statement. You have the paycheck stub. You have the tax return. In addition to his wages, he received $40,000 or $50,000 in bonuses and stocks. It's, again, reflected in the record. Judge Duff had the opportunity to look at those. She calculated what the statutory net would be, and then she reduced it substantially to account for the transportation costs that he has. And the idea of the sharing of transportation, Mom is at home with a teenage daughter, an older son, Landon, and a younger daughter. Mr. Trapacek is a single individual. As had been the pattern throughout the case, Mr. Trapacek is able to jump on Southwest and Houston, fly out, pick him up, take him back. To ask Mom to do this, she would, of course, provide transportation to the airport, but for her to find someone else, her husband works full time, to find someone else to watch these three kids so she could transport is unreasonable. In Judge Duff's order, she does provide that during the summer, the summer Stephanie has to fly down to Texas to pick up Landon to bring him back up for her visitation, and that's on Stephanie's cost. I think in doing the child support, Judge Duff was eminently fair. Mr. Trapacek makes a very substantial income. Stephanie has no income. In balancing the credit, if you will, for the travel cost, I think it's very reasonable. The last thing that Ms. Shearer mentioned was the denial of offers of proof. The record does not bear that out. She requested on multiple occasions to make an offer of proof, and on each occasion that request was granted. It's reflected in the record. The one criticism she had was when she had closed an offer of proof and was going to move on and then wanted to reopen it, Judge Duff said, no, we've been through that. And I think, again, in managing the trial, the record reflects how many times do we need to tell something to the court. And Judge Duff said, I heard it the first time. I don't need to hear it three and four times. Let's move on. Let's try and focus on those things that are relevant. And I would submit to the court that Judge Duff's order is well supported by the evidence. It's the venue in which this child has lived throughout his life. It's the appropriateness of that living relationship. It's the sibling relationship, the big brother, the little sister. It's the way the family works together. It's the opinion of clinical psychologists that this is the appropriate custodial placement. It's not just our witnesses saying that the home is appropriate. It's Mr. Travichek's own home study witness saying that the home is appropriate. Again, we're not here to give our opinion. I'm not here to give anyone's opinion. But this court is not here to give their opinion, to give a second assessment of the evidence, but rather to look and see is there substantive basis for the conclusion that Judge Duff came to. And on the issue of the incidents that occurred, clearly they occurred. There were multiple witnesses. There was a full factual development of that. And the trial judge in the role of the finder of fact and the evaluator of witnesses said it's not a big deal. Judge Duff's been doing this for 20, 25 years. She's seen a lot of cases. I think she is in an excellent position to make that decision. And that is a very small factor in the greater scheme of what's been going on for this little boy for the past four years. I think the order is detailed. It is specific. It recites all of the witnesses. And I think it gives a clear, substantive basis for the ruling. And I would ask the court to affirm that determination. Thank you. Thank you, Mr. Steiger. Ms. Sherrod, do you have any follow-up? Your Honor, Mr. Steiger is incorrect when he says the court did not refuse offers of proof. It's in the record. There were two or three times where she just refused to allow me to make an offer of proof. It's true that one time I wanted to reopen and she said no. I can't talk about what would have been in the record if the offer of proof had been there, but it was information that we thought was really clearly relevant. I don't think the judge properly analyzed or gave credence to the factors and to the evidence we submitted. She made comments to the effect, and I have sort of an appendix of comments by the court, which I think are indicative of her dislike and distaste for my client and his case and the way he was putting it on from the beginning. It's in my reply brief. You'll see everything in there. But there was just a general attitude that my client was being nasty. Well, he was. This is not nice stuff to go up there and portray the parent of your child as a liar, as manipulative. And the judge seemed to indicate she didn't want to hear this stuff. Well, I'm sorry, but this was part of it. And when she talks about the evidence being the same thing over and over again, that's the whole point. That gives more weight to it. You have a bunch of people saying there's domestic violence occurring. Now, if we hadn't done that, then we definitely would have lost. You also have the court, I believe it was on the second day of trial, or the end of the first day, saying something about tomorrow I want to hear stuff that's relevant, I want to address these factors, half of what I've heard today doesn't matter. Well, the majority of that day was spent on domestic violence. I would be concerned about a trial judge indicating that doesn't matter. It clearly matters. It would go to two if not three of the factors under best interest. There are two factors regarding physical violence, and there's one about mental health. And I think there's a concern about mental health when somebody is in an abusive relationship, allowing it to continue, or lying about it. My client does not want his child raised by a liar. He relied on the court to protect him, and they didn't. They didn't protect him at all. And I think if you look at the judge's decision and her comments and her general attitude, it's not a matter of you reviewing the evidence. But there's no way you could have this evidence before you and find what you did about the mother. She indicates that the mother would not do anything to discourage a relationship. How can you say that when she's making transportation difficult? Mr. Stiger says that the mother drives to St. Louis Airport. That's like combing teeth to get her to do it. It's always her schedule this, her schedule that. She can't do it. Well, if she has all this wonderful family around here who's so supportive, why aren't they helping her out with her kids or running Landon back and forth to the airport? I mean, the other thing is she has a teenage daughter or stepdaughter who's a babysitting age. Why can't she have her watch Luke, who's at least 10 or 11 by now, and Abby while she runs to the airport? You know what? Sometimes you have to pinch it. You have to make adjustments for these things. And considering she's the one who has the child the majority of the time, you know, do it. There's no reason not to. And the judge just seems to have constant deference to the mom. And it seems to be almost like her attitude towards the dad was he's wrong in doing this. She criticizes the dad in her order for running and filing petitions for contempt or asking for court relief every time he doesn't get along with mom. That's not what happened. What really happened was you see dad going back and forth with mom trying to resolve it. And when he's at his wits' end, he does go to the court for relief. I think that's about it unless there are any questions. Thank you. Thank you, Ms. Sheridan. Thank you both for your briefs and arguments. And we'll take another five minutes.